In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 13-3836

HEATHER BROWNING,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN, Acting Commissioner of
 Social Security,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3.13-cv-00008-WGH-RLY — **William G. Hussman, Jr.**, *Magistrate
Judge.*

---

ARGUED AUGUST 5, 2014 — DECIDED SEPTEMBER 4, 2014

---

Before BAUER, POSNER, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff, a woman of 25, appeals from the district court's affirmance of the denial of SSI (Supplemental Security Income) benefits, which are paid to low-income people who are aged, blind, or disabled. The program is administered by the Social Security Administration. The plaintiff claims to be disabled by reason of being

mentally retarded ("intellectually disabled," in current jargon) and suffering from knee and hip pain in one leg. The pain is the result of a defect in the hip joint caused by a childhood disease called Legg-Calve-Perthes disease. See Mayo Clinic, "Diseases and Conditions: Legg-Calve-Perthes Disease," www.mayoclinic.org/diseases-conditions/legg-calv e-perthes-disease/basics/definition/con-20035572 (visited Sept. 4, 2014, as were the other websites cited in this opinion).

Her flunking kindergarten was the first sign of a mental deficiency. Two years later she was diagnosed as being "an attention deficient hyperactivity disordered child" who was "mildly mentally retarded." From elementary school through the end of high school she was enrolled full time in "special education." Unable to pass the test required by the state for graduation from high school, she was allowed to graduate anyway by being given a waiver for which students with disabilities are eligible. The administrative law judge's statement that "the claimant has at least a high school education" is thus misleading—especially since he appears to have credited her testimony that "she is able to read on a kindergarten level." Of course anyone who can read at a higher level can *also* read at a kindergarten level, but obviously the administrative law judge meant that the plaintiff can read *only* at a kindergarten level.

A psychologist named Albert Fink administered an IQ test to her in 2007, when she was 18. Her IQ was 68; only about 2.3 percent of the American population has an IQ below 70. She had scored higher in IQ tests that she'd taken as a child, but the administrative law judge did not mention those test results and the government, bowing to *Chenery*,

acknowledges that we therefore can't consider them in deciding whether to affirm the denial of benefits.

Dr. Fink thought her more intelligent than her IQ score of 68 implied, and concluded that she could function in "typical work environments," though he didn't explain what he meant by the term. Three years later two other psychologists evaluated the plaintiff and concluded that despite her serious mental deficiencies she would be able to work. One of them, however, advised that at first she should work part time, and in "sheltered employment," which is a euphemism for work that the job market would not consider productive employment. See 20 C.F.R. § 404.1573(c). The regulation explains that work done in sheltered employment "may show that you have the necessary skills and ability to work at the substantial gainful activity level," but a person capable of working *only* in sheltered employment is deemed disabled and therefore entitled to receive social security disability benefits.

A physician examined the plaintiff at the request of the Social Security Administration. He reported that her hip problem reduced the range of motion of her left leg and caused tenderness in the knee and hip of that leg. He predicted that the problems with her leg would get worse.

At her hearing before an administrative law judge (held in 2011, when the plaintiff was 22), she testified as follows: She lives at home with her mother, who does all the household chores. She can read only "small letters" (apparently she meant short words) and "kindergarten stuff." She does not use a computer and cannot obtain a driver's license because she can't read the test that one must pass to obtain a learner's permit. Her entire work history consists of three

days of part-time janitorial work in high school. She used a wheelchair in high school because of her defective left leg, which makes it difficult for her to walk or stand. She sometimes uses crutches. A further complication, so far as ability to engage in productive employment is concerned, is her severe obesity. She is five feet six inches tall and weighs 240 pounds. Her Body Mass Index is therefore 38.7. A person with a BMI of 30 or higher is classified as obese, and if his or her BMI is above 40 as morbidly obese; the plaintiff's BMI is very close to 40.

Ordinarily a person with an IQ under 70 and at least one additional impairment that imposes a limitation on ability to work (and she has two such impairments—her leg problem and her obesity) is automatically deemed to be disabled. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C). But the administrative law judge concluded that her IQ score of 68 was invalid. He based this conclusion mainly on Dr. Fink's report, which while stating that the plaintiff "appeared to make a sincere effort to perform the test tasks to the best of her ability," opined that because the results of the IQ test included "considerable intratest scatter" this indicated "that there is higher potential and that an estimate of borderline intellectual functioning is the most appropriate conclusion." "Intratest scatter" just means that the variance in her scores on different questions in the IQ test was high. Dr. Fink did not explain why this signified a "higher potential" for intellectual activity. Nor did he opine on how much higher her intellectual potential is, but the implication is that he thought her true IQ at least 70, as that is the bottom of the "borderline intellectual functioning" range, "Borderline Intellectual Functioning," *Wikipedia*, http://en.wikipedia.org/wiki/Border

line_intellectual_functioning, and he thought she was in that range. We'll assume he was correct.

The administrative law judge was also impressed by the statement by another of the psychologists that the plaintiff has a "sarcastic nature," displayed when she said to the psychologist: "They said I was doing normal stuff at school, but I wasn't. I never knew a normal kid who would just take the elevator just to be doing it. Or leaving class to go to Resource. I never used the stairs at school. Is that normal?" That doesn't seem sarcastic—it seems like a serious, though not entirely coherent, effort to explain her failure to fit in at school—but of course we weren't there and maybe her *tone* was sarcastic. But the psychologist didn't actually say he considers mentally retarded people to be incapable of sarcasm, let alone point to a psychological literature that might support such a belief. Chimpanzees have been said to be capable of sarcasm, Wales Ape & Monkey Sanctuary, www.ape-monkey-rescue.org.uk/chimpfacts.html, and their intellectual abilities are bound to be inferior to those of a human being with an IQ of 68 or 70, considering that the chimpanzee's brain is only a third the size of the average human brain (in particular, the human cerebral cortex is much larger than the chimp's). The great apes, including chimpanzees, are believed to have an intellectual capacity equal to that of a 3 or 4 year old human being. See "Chimpanzee," *Wikipedia*, http://en.wikipedia.org/wiki/Chimpanzee#Intelligence; Dennis O'Neill, "Humans," http://anthro.palomar.edu/primate/prim_8.htm. The plaintiff obviously is considerably more intelligent than a 3 or 4 year old.

The administrative law judge thought the fact that the plaintiff goes to "bars and clubs," does some cooking and

shopping, helps care for a pet, watches television, and "only takes over-the-counter pain medications," showed that she can do at least sedentary work. He suggested (probably on the basis of her not using prescription painkillers) that she had outgrown the effects of the Legg-Calve-Perthes disease that she had had as a child, and that her current problems with her left leg were the result of her obesity. (But so what? The issue is the disabling effect of those problems.) He acknowledged that she walks with an "antalgic gait" (which means she limps in order to minimize the pain in her leg) and has a decreased range of motion in the bad leg, along with tenderness and "crepitus" (cracking or popping) in her left knee and left hip.

He bolstered his belief that her IQ test score of 68 was invalid by stating that no one with an IQ below 70 could use sarcasm, though he gave no reason for thinking that and, as we've noted, there doesn't seem to be a convincing basis for his belief. He was playing doctor (mental retardation is a disorder of the brain and functionally therefore a field of medicine), which an administrative law judge is not permitted to do, *Goins v. Colvin*, No. 13-3729, 2014 WL 4073108, at *3 (7th Cir. Aug. 19, 2014); see also *Pates-Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009)—and playing it ineptly. The psychologist who said that the plaintiff's tone had been sarcastic was the one who recommended that the plaintiff start her working career by working part time in sheltered employment. The administrative law judge should have asked the psychologist how likely it is that the plaintiff would graduate, as it were, to normal employment; if not, as we said earlier, she could be found to be disabled.

The administrative law judge committed another error when he instructed the vocational expert who attended the hearing (and whose role is to advise the administrative law judge on what jobs the applicant is capable of doing and how many such jobs there are) to assume that the plaintiff "would be able to perform sedentary work"; would, though unable to "climb ladders, ropes, or scaffolds," be "able to perform all other postural activities occasionally" and also do "pushing and/or pulling occasionally with the bilateral lower extremity" (elsewhere in the opinion "extremities" rather than "extremity"); "would be able to understand, remember and carry out ___ [word inaudible] tasks"; and—critically—"could maintain concentration, consistency and pace of no more than average production standards." Plainly the administrative law judge understated the plaintiff's work-related limitations, in particular her ability to understand, remember, and concentrate.

"Postural activities," to which the administrative law judge referred, are defined as "physical activities such as … stooping, climbing." Social Security Administration, "SSR 96-8p: Policy Interpretation Ruling, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims," July 2, 1996, www.socialsecurity.gov/OP_Home /rulings/di/01/ SSR96-08-di-01.html. The finding that the plaintiff can do "all" such activities other than climbing ladders, ropes, or scaffolds—that she can work in jobs that require her to stoop, crawl, climb stairs, etc.—seems fanciful. As for the "bilateral lower extremities," the reference of course is to the legs, but can the administrative law judge really have meant that the plaintiff is able to work in a job that would require her to push or pull objects with her feet? Could she be a bicycle messenger, which requires strong legs? A taxi driver or

other commercial driver pushes down on the gas pedal and the foot brake, and no great effort is required, but the plaintiff cannot qualify for an ordinary driver's license, let alone for a commercial license.

In reviewing the determination that the plaintiff is not disabled, the magistrate judge said that the vocational expert, having attended the hearing, must have factored the limitations of the plaintiff's ability to work that the record revealed into her conclusion that there are jobs the plaintiff can fill. But there is no evidence, or reason to believe, that the vocational expert would have thought it a proper role for herself to change the administrative law judge's instruction regarding what the vocational expert should assume in assessing the plaintiff's ability to work. The vocational expert could have suggested to the administrative law judge that the instruction be corrected, but she didn't do that. Furthermore, she testified that she was familiar with the plaintiff's vocational background (consisting, remember, of a single job, which lasted only three days), but did not testify that she was familiar with the plaintiff's medical records.

Regarding this effort by the magistrate judge to salvage the administrative law judge's denial of benefits to the plaintiff, the government has to its credit pointed out that he erred; *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), holds that the vocational expert cannot rely on his own review of the record to determine the claimant's ability to work, if the administrative law judge, in posing to the vocational expert the required hypothetical question of what jobs the claimant has the ability to perform given her limitations, omits one of those limitations from the question. In

this case the administrative law judge omitted several limita-tions.

There is more that's wrong with the administrative law judge's decision, including his failure, which continues to be endemic in the Social Security Administration's disability adjudications despite our frequent criticisms of it (most re-cently in the *Goins* opinion, cited earlier), to consider the bearing of obesity, even when not itself disabling, on a claimant's ability to work. In determining disability an ad-ministrative law judge must consider the *combined* effects of the applicant's impairments. A regulation of the Social Secu-rity Administration, 20 C.F.R. § 404.1523, states that "we will consider the combined effect of all of your impairments without regard to whether any such impairment, if consid-ered separately, would be of sufficient severity." With spe-cific reference to obesity, see Social Security Administration, SSR 02-1p: Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg. 57859, 57861–63 (Sept. 12, 2002), and the criticism in Christopher E. Pashler, "Mirror, Mirror on the Wall: Stigma and Denial in Social Security Disability Hearings," 43 *University of Memphis Law Rev*iew 419 (2012), of the agency's handling of obesity.

The administrative law judge acknowledged that the plaintiff's obesity was a factor in her leg pain, but did not discuss its bearing on her ability to do sedentary work. Re-member that she's almost morbidly obese. This might make it difficult for her to sit for long periods of time, as sedentary work normally requires. Presumably she could get up from her work table from time to time, but that might be painful given her obesity—the sheer weight she must lift—and her leg pain, which is aggravated by standing, since standing

requires her legs to support her great weight. We don't want to play doctor ourselves; but the likely difficulties that morbidly obese persons (and the plaintiff is almost morbidly obese) face even in doing sedentary work are sufficiently obvious to have required the administrative law judge to instruct the consulting physician to consider the potential effect of the plaintiff's obesity on her ability to do sedentary work.

The administrative law judge, who twice repeated that the plaintiff likes to go to "clubs and bars," noted also that the psychologist who had called the plaintiff sarcastic (yet also recommended sheltered employment for her) said she "admitted being spoiled, exuded an air of entitlement especially when discussing public aid, and admitted to performing activities such as walking in the woods." He remarked the plaintiff's "lack of motivation" and treated all these features of the plaintiff's personality as character defects or (so far as "walking in the woods" was concerned) evidence of ability to work. He did not consider the possibility that low IQ, near-morbid obesity, and a painful, malfunctioning hip and knee might cause behaviors that would further reduce a person's ability to work.

We also find in the administrative law judge's opinion the same confusion, noted in our *Goins* decision, caused by a pernicious bit of boilerplate to which the Social Security Administration nevertheless clings. It is that although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms … , the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual func-

tional capacity assessment." The implication is that the assessment of the claimant's ability to work precedes and may invalidate the claimant's testimony about his or her ability to work. Actually that testimony is properly an input into a determination of ability to work.

So what is one to make of the administrative law judge's statement that the medical determination that the plaintiff has an antalgic gait and other problems with her legs, "while … significant, … do[es] not suggest the claimant is unable to perform work at the level of her residual functional capacity." The implication (as in *Goins* and other cases in which we've inveighed against the boilerplate) is that residual functional capacity (ability to engage in gainful employment) is determined *before* all the evidence relating to the claimed disability is assessed, whereas in truth all that evidence is material to determining the claimant's residual functional capacity.

There is still another problem with the decision to deny the plaintiff benefits, more precisely perhaps an omission, remarked on by neither party. The plaintiff lives with her mother in a small town in southwestern Indiana, population 3500, named Chandler. There is bus service to Evansville, however, a city whose metropolitan has a population of more than 300,000. The vocational expert calculated that the plaintiff's residual functional capacity would enable her to perform such jobs as hand packer, production helper, and miscellaneous laborer, and that there are 127 such jobs in the Chandler "area," in which the vocational expert presumably meant to include Evansville. For she testified that there are only 1683 such jobs in all of Indiana, a state with a population of more than six and a half million. We can't imagine

the plaintiff's being able to live by herself; she's stuck in Chandler. There are of course a much larger number of such jobs in the American economy as a whole (about 350,000 according to the vocational expert). But if as seems to be the case the plaintiff is incapable, by reason of her mental and physical condition, of seeking work outside the Chandler area, it is hard to see the relevance of job opportunities elsewhere in the United States. Needless to say there is no information on how many of the 127 jobs in the Chandler area are likely to be vacant, and how many of those jobs are ones the plaintiff could do. Obviously many (we imagine most) production helpers and miscellaneous laborers are not sedentary workers, leaving the hand packers (more about hand packing below).

It's true that a regulation of the Social Security Administration states that "we consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether … work exists in the immediate area in which you live." 20 C.F.R. § 404.1566. The reason the vocational expert is required to estimate the number of jobs the claimant can do that exist in the local, regional, and national economy is that, as the regulation indicates, if there is a large number of such jobs in any of the three areas ("region" presumably encompassing both a local area and the entire state), the claimant loses. The peculiarity of this case is that it is the claimant's disability that makes the number of jobs in the region or the nation irrelevant, because it prevents her from moving. That immobility is a consequence of the disability, and so needs to be factored into the analysis of job availability. See, e.g., *Harmon v. Apfel*, 168 F.3d 289, 291–93 (6th Cir. 1999); *Jenkins v. Bowen*, 861 F.2d

1083, 1087 (8th Cir. 1988); *Donato v. Secretary of Health & Human Services*, 721 F.2d 414, 419 (2d Cir. 1983).

There is more that is wrong with the administrative law judge's assessment of the jobs that the plaintiff might be able to fill. Remember that "hand packer" comes first in the vocational expert's list, and in the administrative law judge's list as well (for he appears to have relied on the vocational expert's advice), of jobs the plaintiff can fill. The vocational expert did not describe the job of a "hand packer"; she merely cited to a section of the Dictionary of Occupational Titles, a compendium of job descriptions published by the Department of Labor. But the section she cited to, DOT 920.687-030, is not captioned "hand packer," but "hand bander (tobacco)"—a worker who wraps cigars. Nevertheless the administrative law judge cited the same section in concluding that the plaintiff has the residual functional capacity to be a hand packer. For all we know, the plaintiff could wrap cigars, but needless to say the vocational expert did not indicate how many tobacco hand bander jobs exist in the area, region, or nation.

There is no occupational title "hand packer." The closest is "hand packager." U.S. Department of Labor, *Dictionary of Occupational Titles*, § 920.587-018 (4th ed. 1991). We set forth its description in full in the appendix. It is apparent from the description that many of the jobs are beyond the plaintiff's capacity to do. And there is no indication that the administrative law judge, or for that matter the vocational expert, was even aware of the DOT's hand-packager description.

A further problem is that the job descriptions used by the Social Security Administration come from a 23-year-old edition of the *Dictionary of Occupational Titles*, which is no long-

er published, and mainly moreover from information from 1977—37 years ago. No doubt many of the jobs have changed and some have disappeared. We have no idea how vocational experts and administrative law judges deal with this problem.

We also have no idea what the source or accuracy of the number of jobs that vocational experts (including the one in this case, whose estimates the administrative law judge accepted without comment) claim the plaintiff could perform that exist in the plaintiff's area, the region, or the nation. There is no official source of number of jobs for each job classification in the *Dictionary of Occupational Titles*, and while there are unofficial estimates of jobs in some categories, the vocational experts do not in general, and the vocational expert in this case did not, indicate what those data sources are or vouch for their accuracy. And many of them estimate the number of jobs of a type the applicant for benefits can perform by the unacceptably crude method of dividing the number of jobs in some large category (which may be the only available data) by the number of job classifications in the category, even though there is no basis for assuming that there are, for example, as many mophead trimmer-and-wrappers, DOT 789.687-106, as there are fish-egg packers, DOT 529.687-086, or poultry-dressing workers, DOT 525.687-082—all being hand-packager jobs.

Most serious, perhaps, as far as we're able to ascertain there are no credible statistics of the number of jobs doable in each job category by claimants like the plaintiff in this case who have "limitations," in her case mental retardation, obesity, and the residual effects of her childhood disease of the leg. The vocational expert's statistics were for all jobs in

categories in which some jobs, but clearly not all, might be within the plaintiff's capacity to perform. For useful discussions of these and other problems encountered in trying to estimate the number of jobs in area, region, and nation that applicants for benefits can perform, see, e.g., Peter Lemoine, "Crisis of Confidence: The Inadequacies of Vocational Evidence Presented at Social Security Disability Hearings," 2012, www.lemoinelawfirm.com/wp-content/uploads/2012/seminar_materials.pdf; Nathaniel Hubley, "The Untouchables: Why a Vocational Expert's Testimony in Social Security Hearings Cannot Be Touched," 43 *Valparaiso Law Review* 242 (2008), and references cited in these articles.

The judgment of the district court is reversed and the case remanded to that court with instructions to remand the case to the Social Security Administration.

## APPENDIX: DESCRIPTION OF "HAND PACKAGER" JOB CLASS IN THE DICTIONARY OF OCCUPATIONAL TITLES

**920.587-018 PACKAGER, HAND**

Industry Designation: Any Industry

Alternate Titles: Hand Packager

Packages materials and products manually, performing any combination of following duties: Cleans packaging containers. Lines and pads crates and assembles cartons. Obtains and sorts product. Wraps protective material around product. Starts, stops, and regulates speed of conveyor. Inserts or pours product into containers

or fills containers from spout or chute. Weighs containers and adjusts quantity. Nails, glues, or closes and seals containers. Labels containers, container tags, or products. Sorts bundles or filled containers. Packs special arrangements or selections of product. Inspects materials, products, and containers at each step of packaging process. Records information, such as weight, time, and date packaged. May stack, separate, count, pack, wrap, and weigh bakery products and be designated Bakery Worker (bakery products). May apply preservative to aircraft and spaceship parts, package parts for shipment, and be designated Wrapper and Preserver (aircraft mfg.). May be designated according to whether high-production or small-lot packaging as Fancy Packer (retail trade; wholesale tr.); Packaging-Line Attendant (any industry); specific packaging duty performed as filling, wrapping, packing, labeling, and container cleaning as Sack Sewer, Hand (any industry); kinds of equipment used or product packaged as Candle Wrapper (fabrication, nec); Carton Stapler (any industry); or whether packager performs associated duties as final assembly before packaging product as Novelty-Balloon Assembler And Packer (rubber goods). May weigh and package meat in retail store and be designated Meat Wrapper (retail trade). May be designated: Bagger (any industry); Bow Maker, Gift Wrapping (any industry); Box Maker, Cardboard (any industry); Box Wrapper (any industry); Bundler (any industry); Candy Packer (sugar & conf.); Caser, Rolled Glass (glass mfg.); Coil Strapper (steel & rel.); Container Filler (any industry); Filler (any industry); Furniture Packer (retail trade); Grader, Sausage And Wiener (meat products); Guncotton Packer (chemical); Inserter, Promotional Item (any industry); Inspector-Packager (any industry); Lidder (any industry); Mattress Packer (furniture); Packager, Meat (meat products); Packer, Dried Beef (meat products); Packer, Foamed-In-Place (any industry); Packer, Sausage And Wiener (meat products); Piece-Goods Packer (textile); Scaler, Sliced Bacon (meat products); Sponge Packer (wholesale tr.); Stamper (any industry); Table Worker (any industry); Tube Packer (rubber tire); Wrapper (any industry); Wrapper,

Hand (can. & preserv.); Wrapping Remover (any industry). Workers who tend packaging machines are classified under PACKAGER, MACHINE (any industry) 920.685-078.

GUIDE FOR OCCUPATIONAL EXPLORATION: 06.04.38

STRENGTH: Medium Work - Exerting 20 to 50 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or 10 to 25 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or greater than negligible up to 10 pounds of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Light Work.

Reasoning: Level 2 - Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

Math: Level 1 - Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

Language: Level 1 - READING: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.

WRITING: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

SPEAKING: Speak simple sentences, using normal word order, and present and past tenses.

SPECIFIC VOCATIONAL PREPARATION: Level 2 - Anything beyond short demonstration up to and including 1 month

Data: 5 - Copying
N - Not Significant

People: 8 - Taking Instructions-Helping
N - Not Significant

Things: 7 - Handling
S - Significant

Field 1: 041 - Filling-Packing-Wrapping

Field 1: 898 - Production Services (stock chasing, timekeeping, etc.)

General Learning Ability: Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability

Verbal Aptitude: Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability

Numerical Aptitude: Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability

Spacial Aptitude: Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability

Form Perception: Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability

Clerical Perception: Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability

Motor Coordination: Level 3 - Middle 1/3 of the Population
Medium Degree of Aptitude Ability

Finger Dexterity: Level 3 - Middle 1/3 of the Population
Medium Degree of Aptitude Ability

Manual Dexterity: Level 3 - Middle 1/3 of the Population
Medium Degree of Aptitude Ability

Eye-Hand-Foot Coordination: Level 5 - Bottom 10% of the Population
Markedly Low Aptitude Ability

Color Discrimination: Level 4 - Lowest 1/3 Excluding Bottom 10% Low Degree of Aptitude Ability

R: Performing REPETITIVE or short-cycle work

Climbing: Not Present - Activity or condition does not exist

Balancing: Occasionally - Exists up to 1/3 of the time

Stooping: Not Present - Activity or condition does not exist

Kneeling: Not Present - Activity or condition does not exist

Crouching: Not Present - Activity or condition does not exist

Crawling: Not Present - Activity or condition does not exist

Reaching: Constantly - Exists 2/3 or more of the time

Handling: Constantly - Exists 2/3 or more of the time

Fingering: Constantly - Exists 2/3 or more of the time

Feeling: Not Present - Activity or condition does not exist

Talking: Not Present - Activity or condition does not exist

Hearing: Occasionally - Exists up to 1/3 of the time

Tasting/Smelling: Not Present - Activity or condition does not exist

Near Acuity: Occasionally - Exists up to 1/3 of the time

Far Acuity: Not Present - Activity or condition does not exist

Depth Perception: Occasionally - Exists up to 1/3 of the time

Accommodation: Not Present - Activity or condition does not exist

Color Vision: Occasionally - Exists up to 1/3 of the time

Field of Vision: Not Present - Activity or condition does not exist

Exposure to Weather: Not Present - Activity or condition does not exist

Extreme Cold: Not Present - Activity or condition does not exist

Extreme Heat: Frequently - Exists from 1/3 to 2/3 of the time

Wet and/or Humid: Not Present - Activity or condition does not exist

Noise Level: Level 4 - Loud

Vibration: Not Present - Activity or condition does not exist

Atmospheric Cond.: Frequently - Exists from 1/3 to 2/3 of the time

Moving Mech. Parts: Not Present - Activity or condition does not exist

Electric Shock: Not Present - Activity or condition does not exist

High Exposed Places: Not Present - Activity or condition does not exist

Radiation: Not Present - Activity or condition does not exist

Explosives: Not Present - Activity or condition does not exist

Toxic Caustic Chem.: Not Present - Activity or condition does not exist

Other Env. Cond.: Not Present - Activity or condition does not exist.