NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted November 19, 2014[*]
Decided December 4, 2014

**Before**

DIANE P. WOOD, *Chief Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 14-1692

| | |
|---|---|
| DONEL R. GULLY, JR., *Plaintiff-Appellant,* | Appeal from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 12-cv-1063 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, *Defendant-Appellee.* | Michael J. Reagan, *Chief Judge.* |

**O R D E R**

Donel Gully, a 50-year-old who suffers from leg pain and mental illness, appeals the district court's judgment upholding the denial of his application for supplemental security income. He argues that the administrative law judge erred by finding him not credible and by overstating his residual functional capacity. Because the ALJ's credibility determination is not patently wrong and substantial evidence supports the RFC determination, we affirm the district court's judgment.

---

[*] We granted the parties' joint motion to waive oral argument. *See* FED. R. APP. P. 34(f). Thus, the appeal is submitted on the briefs and the record.

Gully was shot several times in the right leg by a police officer in October 2007. The bullets shattered his thigh bone just above the knee and fractured his shinbone. He underwent multiple surgeries at St. Louis University Hospital; plates were attached to both of the fractured bones. When Gully returned to the hospital the following month to have the surgical staples removed, he reported that he was experiencing unbearable pain—burning and aching in his leg and foot that kept him up at night. A doctor examined Gully, noted that the wounds were healing normally, and prescribed pain medication.

During the next couple of months, Gully had two more follow-up visits to the hospital and complained of pain each time. Both times the doctor prescribed pain medication and physical therapy. At the second visit, the doctor noted that Gully would "be seen back in 3 months," but Gully never returned for a checkup.

Gully applied for supplemental security income almost two years later, in October 2009, alleging that he was disabled because he had been shot and thus had "no use of [his] right leg." His application contained conflicting information about the onset date of his disability: he answered on the application that this injury "first interfere[d]" with his ability to work in "10/2007," but stated later on the same page that he "became unable to work" because of the injury a year earlier—on "11/08/2006." Gully also stated that he had never worked, but tax records obtained by the agency show that Gully has reported income for 11 years since 1986.

Gully later supplemented his application with a completed "function report" form describing his leg pain. He wrote that he soaked his leg in hot water every day to ease the pain, that he was unable to stand for more than 20 minutes or walk more than a couple of blocks at a time because of the pain, and that he sometimes did chores like making his bed or washing the dishes but usually did not make his own meals.

Gully also reported on the form that he had mental limitations related to his leg injury. He stated that, although he had "no problem pay[ing] attention" or managing his finances, the pain from the injury affected his concentration and ability to complete tasks. Gully explained that, because of the pain, he was depressed, he spent many days "recovering from crying spells," and he had problems getting along with people.

In October 2009, an agency field officer interviewed Gully and noticed no physical or mental difficulties. The officer wrote that Gully alleged having "no use" of

his right leg, yet he "was able to walk away from the interview and across the street with no trouble."

Two months later, Gully was examined by a state-agency physician, internist Vittal Chapa, who concluded that Gully had several limitations from his leg injury. Dr. Chapa noted in his report that Gully's right leg and ankle were swollen and had limited range of motion, and that he had an antalgic gait (meaning that he walked so as to avoid pain). Dr. Chapa also observed that Gully could not tandem walk, walk on his toes or heels, or squat and arise, but that he had only mild difficulty getting on and off the exam table. Gully told Dr. Chapa that he "occasionally" smoked marijuana but that he didn't smoke tobacco, abuse alcohol, or use any prescription drugs.

The following month, Gully was examined by a second state-agency physician, psychologist Harry Deppe, who diagnosed him with cannabis abuse, adjustment disorder with mixed emotional features, and personality disorder with antisocial features. Gully told Dr. Deppe that he had been incarcerated seven times, most recently for possessing marijuana, and that he was last released from prison three months before.[1] He reported that he had last used marijuana two weeks before and that he had a history of using the drug, but that he did not use alcohol and had never been treated for substance abuse or any mental illness. Gully also recounted that he had last worked in 2006 and had "been a mechanic off and on for years." Based on the interview, Dr. Deppe opined that Gully had only a fair ability to complete tasks on time, relate to others, understand and follow simple instructions, maintain attention, and withstand work-related stress. He rated Gully's Global Assessment of Functioning (GAF) score[2] as 50; this score indicates serious symptoms such as suicidal ideation or a "serious impairment in social, occupational, or school functioning." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 34 (4th ed. 2000); *see Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) (noting that a GAF score of 50 reflects "serious symptoms or any serious impairment in functioning, for example, being unable to keep a job").

---

[1] We note that a claimant may not receive any SSI for any months during which he was imprisoned for a felony. *See* 42 U.S.C. § 1382(e)(1); 20 C.F.R. § 404.468.

[2] Although the American Psychiatric Association no longer uses this metric, *see* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013), the GAF score was still in use at the time of the psychiatric evaluations recounted in this record.

Glen Pittman, a psychiatrist consulting for the Social Security Administration, reviewed Gully's medical records and concluded that he had only "mild" functional limitations. Dr. Pittman opined that Gully's impairments—including antisocial personality disorders, affective disorders, and an addiction to marijuana—were not severe.

The Social Security Administration denied Gully's application for benefits in February 2010 and in June 2010 upheld the decision on reconsideration, concluding that Gully was able to do sedentary work. Gully, who by this time was represented by an attorney, requested a hearing before an ALJ.

Nine months before the hearing, Gully was examined in connection with his application by psychiatrist S. A. Raza, who diagnosed him with post-traumatic stress disorder (caused by his having been shot), cannabis dependence, and major depressive disorder. Dr. Raza reported that Gully had only fair cognitive abilities and that his emotional and social abilities were poor. Dr. Raza rated Gully's GAF score as 55, indicating either moderate symptoms such as occasional panic attacks or "moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34. Gully told Dr. Raza that he already had seen three psychiatrists, most recently during the past year. When asked about his education and employment history, Gully told Dr. Raza that he was an "11th grade dropout" and that he used to have a lawn-mowing service. Dr. Raza noted that Gully "became tearful" during their conversation.

At his hearing before the ALJ in October 2011, Gully testified about his physical and mental impairments.[3]  He said that he had been shot in the leg, back, ribs, and spine; that he had rods and screws in his right leg; that he had sharp and burning pain in his leg "every day, all day"; and that he had calluses on his left foot and pain in his back from the way he had to walk. Gully testified that he could walk for 10 or 15 minutes, stand for 5 or 10 minutes, and lift about 75 pounds. He never stated how long he could sit, but did say that he had to lie down "to get rid of the pain" when he sat for a longer period. He also stated that he spent 13 to 14 hours a day lying down. Gully said, as he had in his application, that he was shot in October 2007 but that he became disabled a year earlier (he did not say how). He was able to shower independently, he testified, but his father did all of the household chores. Gully explained that he never had physical therapy because he couldn't afford it and that, although pain medications

---

[3] At the beginning of the hearing, Gully apparently became distraught, began crying, and had to leave the room.

(like Vicodin) didn't help the pain, he did soak his leg in the bathtub every day. He testified that he couldn't sleep because of the pain and that he used marijuana to fall asleep but hadn't used it recently because he had no money. He often had crying spells, he said, and could not deal with crowds or strangers. The ALJ asked whether Gully had tried to get treatment for his mental illness at a free clinic, and his lawyer replied that there were no free clinics in the area. When questioned by the ALJ about his employment history, Gully acknowledged for the first time that he had worked as a janitor in 2002.

The ALJ asked a vocational expert about the work available to a hypothetical claimant of Gully's age who could do only light work involving simple, routine, repetitive tasks that required only occasional contact with the public, co-workers, and supervisors. The vocational expert testified that such a claimant would be able to work as a janitor, a cafeteria attendant, and an assembler of small products. When asked whether there were any *sedentary* jobs with the same limitations, the vocational expert responded that the only such job available was as an assembler of small products. The vocational expert explained that, if the hypothetical claimant had no ability to follow work rules, a poor ability to deal with co-workers, the public, or supervisors, and a poor ability to understand, remember, and carry out complex job instructions, the claimant would be unable to do *any* of the jobs. She also stated that a person who needed to spend 20 percent of the workday lying down would be unable to do even sedentary work.

The ALJ applied the five-step evaluation process and denied Gully's application for benefits. *See* 20 C.F.R. § 416.920. The ALJ concluded that Gully had not worked since his application date (Step 1); that the injury to his leg was a severe impairment but that his psychological disorders were not (Step 2); that his impairments did not meet or equal a listed impairment (Step 3); that he was unable to perform his past relevant work (Step 4); and that he could perform the full range of sedentary work (Step 5). In assessing Gully's residual functional capacity, the ALJ determined that Gully was not credible because he had provided inconsistent information regarding the date he became disabled, his work history, and his prior mental-health treatment. The ALJ also gave little weight to Dr. Raza's opinion because, among other things, it relied heavily on Gully's subjective complaints and was inconsistent with Dr. Deppe's report.

After the Appeals Council denied his request for review,[4] Gully sued in federal court. He argued that the ALJ had failed to provide a rational basis for his RFC determination and that the ALJ's credibility findings were "improper and insufficient."

The district court upheld the ALJ's decision. The court reasoned that the ALJ's use of boilerplate language did not warrant remand because the ALJ had supported his conclusion "with reasons derived from the evidence." Specifically, the ALJ had thoroughly discussed Gully's testimony and identified "obvious" discrepancies that cast doubt on his credibility. The district court also concluded that the ALJ had a good reason for giving little weight to Dr. Raza's opinion regarding Gully's mental and psychological impairments: it was inconsistent with other evidence, it was inconsistent with Gully's daily activities, and it was based largely on Gully's subjective complaints, which were not credible.

On appeal, Gully repeats his argument that the ALJ made "improper and insufficient credibility findings regarding Gully's testimony." He maintains that the ALJ's explanation of his credibility findings was inadequate because the findings were not "specific," and because the ALJ used boilerplate language when he wrote that Gully's "statements concerning the intensity, persistence, and limiting effects of such symptoms 'are not credible to the extent they are inconsistent with' the ALJ's RFC determination."

As the Commissioner points out, we have previously rejected similar arguments. The use of boilerplate language does not undermine the ALJ's credibility findings if the ALJ otherwise justifies his conclusion. *See Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 311–12 (7th Cir. 2012). The ALJ here gave a legitimate reason for finding that Gully was not credible: Gully's inconsistent statements regarding the date he became disabled (asserting on his application both that he was shot in October 2007 but that he became disabled in November 2006), his work history (saying that he had never worked, when his earnings history showed that he had), and his prior mental-health treatment (telling Dr. Deppe that he had never received

---

[4] Gully had asked the Appeals Council to review new evidence of a hand injury, the result of being shot in the right hand two weeks after the ALJ denied his application. The Council refused to consider the evidence because it did not affect the ALJ's determination that he was not disabled on or before December 1, 2011. The Council told Gully that he could file a new claim if he wished to try to establish disability based on the hand injury. On appeal, Gully makes no argument related to the hand injury.

treatment for mental illness but telling Dr. Raza that he had). *See* SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). Because the ALJ provided support for his credibility determination, the determination is not "patently wrong" and does not merit reversal. *See Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

Gully next argues that, in assessing residual functional capacity, the ALJ failed to consider all of his limitations—specifically, the mental illnesses diagnosed by Dr. Raza and the leg swelling and limited range of motion noted by Dr. Chapa. But this argument falters because the ALJ need only "minimally articulate" his reasoning for the weight assigned to a physician's opinion. *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012); *Elder*, 529 F.3d at 415. The ALJ's explanation cleared this low bar. The ALJ noted that Dr. Raza's "report shows heavy reliance" on Gully's subjective complaints. Given that the ALJ had determined Gully was not credible, the ALJ logically assigned little weight to Dr. Raza's opinion. Moreover, the ALJ concluded that Dr. Raza's opinion conflicted with the opinion of Dr. Deppe, whose assessment reflected a higher ability to perform work-related activities. Gully does not argue that the ALJ's conclusion was improper. As for Dr. Chapa's report, Gully contends that it supports "additional limitations," including "the need to lie down more than 20 percent of the workday, and more limited standing and walking." But Dr. Chapa never opined that Gully needed to spend so much time lying down, and Gully does not explain how the ALJ's assessment—that he could, with normal breaks, lift 10 pounds occasionally, stand or walk for 2 hours a day, and sit for 6 hours a day—didn't adequately account for the limitations noted in Dr. Chapa's report.

In closing, we note that there are some problems with the ALJ's analysis, but they cannot serve as the basis for remand because Gully does not identify these shortcomings in his brief (and thereby waives any such challenges). *See Ramos v. City of Chicago*, 716 F.3d 1013, 1020 (7th Cir. 2013). The ALJ reasoned, for example, that the GAF scores assessed by both Dr. Deppe and Dr. Raza were entitled to little weight because Gully was using marijuana and not undergoing any treatment for his mental health. It may be reasonable to assume that lack of treatment affected Gully's GAF scores, but neither doctor stated that the score was affected by his marijuana use, so the ALJ arguably was playing doctor when he concluded that Gully's marijuana use invalidated the scores. *See Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014) (ALJ was impermissibly "playing doctor" by concluding that claimant's ability to use sarcasm invalidated her low IQ test score). And the ALJ was misguided when questioning

Gully's assertion that he could not afford treatment despite being able to buy marijuana. Gully had testified that other pain medications he tried didn't work, and the ALJ never considered the possibility that marijuana may be cheaper than prescription medications or physical therapy. *See McClesky v. Astrue*, 606 F.3d 351, 353 (7th Cir. 2010). Gully does allude to this problem with the ALJ's analysis when he says that "[t]he ALJ insufficiently accounted for [his] financial circumstances and his inability to afford treatment and medications." But he waived this argument by not developing it. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 n.1 (7th Cir. 2014); *Jordan v. Binns*, 712 F.3d 1123, 1134 (7th Cir. 2013).

AFFIRMED.