In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1727

KYLE D. ALAURA,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN, Acting Commissioner of Social
Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:13-CV-287-PPS — **Philip P. Simon**, *Chief Judge.*

ARGUED AUGUST 4, 2015 — DECIDED AUGUST 18, 2015

Before POSNER, KANNE, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* In September 2010, a 22-year-old
man named Alaura, the plaintiff in this social security disa-
bility case, was struck in the back of his head by an assailant
wielding a bar stool as a weapon. The blow shattered his
skull, necessitating emergency surgery to remove a portion
of his brain and place a metal plate in his skull. During this

craniotomy Alaura had a seizure, for which he was medicated. He remained hospitalized for eight days.

Two months after the surgery Alaura went to see Jeffrey Kachmann, the neurosurgeon who had operated on him, complaining of headaches, dizziness, and confusion. Dr. Kachmann thought that Alaura was improving, but needed further tests before it could be determined whether he could return to work.

A month later Alaura was examined by a neurologist, Thomas Banas, who diagnosed Alaura with post-traumatic headaches and a cognitive impairment caused by the injury to his brain. At about the same time Dr. Kachmann decided that Alaura, who was continuing to take anti-seizure medication and for whom Dr. Banas had prescribed pain medication in addition, was not to return to work until March 2011.

In January 2011 Alaura complained to Dr. Kachmann of daily headaches and was found to be suffering from occipital neuralgia. That is an injury to or inflammation of nerves that run from the spinal cord at the base of the neck up through the scalp. It causes piercing or throbbing pain in the neck, the back of the head, and the front of the head behind the eyes. Kachmann prescribed a nerve block to lessen the pain.

The next month brought a lessening of pain, though the pain returned the month after that, and Dr. Banas prescribed another nerve block plus an antidepressant drug commonly used to treat chronic pain conditions, including persistent headaches. A year later (March 2012), Alaura visited a family practitioner, a Dr. Ted Crisman, telling him he could no longer afford Dr. Kachmann or Dr. Banas. He said he was

having daily headaches, and Dr. Crisman prescribed an antidepressant. Alaura also complained that he was having "absence-type" seizures several times a week—brief lapses of consciousness in which he would blank out or zone out for a couple of minutes. Around the same time he was visiting a chiropractor for back and neck pain, and received some relief from the chiropractor's ministrations.

His headaches continued, however. He reported to a neurologist named John Collins (who examined him nine days before and three weeks after his hearing before the administrative law judge assigned to his case, and whose report was available to her when she wrote her opinion), and a pain specialist named William Hedrick, that although his headaches had been improving he was still experiencing persistent headaches several times a week that were interfering with his normal activities. The doctors diagnosed Alaura with chronic daily headaches, left occipital neuralgia, atypical spells with suspected seizure activity, myofascial pain—pressure on sensitive points in the muscles—in his neck, dizziness, and a mood disorder. They also concluded that Alaura's staring spells, during which he would experience disorientation, confusion and lethargy, were consistent with complex partial seizure activity. "Patients experiencing a complex partial seizure may stare blankly into space, or experience automatisms (non-purposeful, repetitive movements)." Johns Hopkins Medicine, "Neurology and Neurosurgery: Complex Partial Seizures," www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/epilepsy/seizures/types/complex-partial-seizures.html (visited August 17, 2015, as were the other websites cited in this opinion). The doctors prescribed two more nerve blocks, seizure and mi-

graine medication, and additional antidepressants for pain and depression.

The administrative law judge mentioned none of this. She said only that the doctors' "physical examination findings were usually within normal limits, except for tenderness over his scalp, neck, and shoulders, as well as sharpened Romberg." She did not explain the significance of "usually," the significance of "tenderness over his scalp, neck, and shoulders," or what she meant by "sharpened Romberg." There is a Sharpened Romberg *Test*—a test of balance; we don't know what she meant by saying that Alaura had a "sharpened Romberg." That he had taken such a test and passed? Taken it and it had revealed a balance problem?

The administrative law judge noted that an EEG (electroencephalogram) of Alaura taken around the same time was normal, yet she did not mention that the accompanying exam notes repeated the diagnoses by Drs. Collins and Hedrick of pain, seizures, dizziness, and mental-health problems such as depression.

Both Alaura and his mother (he lives in her home) testified at the hearing before the administrative law judge. They were the only witnesses, unless the vocational expert, whom we discuss later, should be considered a witness. Alaura testified to a variety of ailments. A partial list would include constant headache, severe headaches a couple of times a week that make him sick and are exacerbated by bright lights ("photophobia") and force him to go to bed, nausea from headaches, an occasional loss of feeling in one arm, mood swings, hearing loss, neck pain, a weakness in his right leg that sometimes causes him to fall, tremors in his

hands, dizziness in standing, anxiety, nightmares, and difficulty gripping objects. He testified that he can play video games only for five minutes at a time because the light from the screen bothers him (i.e., his play is inhibited by his photophobia), that he can't mow the lawn because the jarring motion of the lawnmower makes him sick, and that five or ten minutes after sitting down he falls asleep.

His mother added that at times he stares blankly into space (consistent with his diagnosis of complex partial seizures), that he has trouble finishing projects, that he can't drive, that she's reluctant to leave him alone in the house, that he leaves stove burners on, has dizzy spells, and cannot walk far and that she has to remind him to take his medications, brush his teeth, and take out the garbage. These lists, the mother's and the son's, of the son's ailments and deficiencies are only partial.

On the basis of the testimony and medical records, the administrative law judge determined that Alaura indeed suffers from multiple severe impairments—traumatic brain injury, seizure disorder, neuropathic pain (chronic pain caused by injury to the nervous system), headaches, occipital neuralgia, insomnia, cognitive disorder caused by his brain injury, adjustment disorder (a tendency to go to pieces under stress), anxiety disorder, and mood disorder. Nevertheless she concluded that Alaura is not totally disabled—that he can perform light work that involves no concentrated exposure to bright lights or jarring movements, no having to climb ropes (are there any rope-climbing jobs anymore?) or ladders or work on scaffolds, no commercial driving, and no more than superficial interaction with members of the public. Asked what jobs he can do given these limitations, a vo-

cational expert testified that he would be able to work as a retail marker, hand packager, or addresser. A retail marker does such things as placing price tickets on articles of merchandise; a hand packager does packaging by hand and performs related tasks such as sealing and weighing containers and inspecting materials at various stages of the packaging process; an addresser addresses envelopes and other items by either hand or typewriter.

The grounds on which the administrative law judge concluded that Alaura's long list of impairments did not disable him from light work (which is not, with the exception of the addresser, sedentary work—the marker and the packager are bound to spend a lot of time standing) are that nerve blocks and other medications had reduced the severity of his impairments, that he went for significant periods of time (aggregating to eight months since his brain surgery) without taking medications or seeing doctors, that he was on Medicaid yet hadn't sought treatment at low-cost or free clinics, and that he could prepare soup and sandwiches for himself, do laundry, send text messages on a cellphone, feed his two cats and change their litter, count change, handle bank accounts (whatever that means), play video games (though apparently only for five minutes at a time), take his medications with only occasional reminders by his mother to do so, and get along with other people. How being able to feed cats, make a sandwich, etc., prepare one for full-time employment as a retail marker, hand packager, or addresser was left unexplained. Handling bank accounts certainly sounds like an activity that prepares one for gainful employment, but the meaning of the phrase was not explained.

The administrative law judge noted that Alaura has not had further brain surgery, or been hospitalized, and that a physical examination in 2011 had yielded findings "essentially within normal limits, except for numbness in his scalp, tenderness over his occipital ridge, swaying with closed eyes, and a slow, deliberate gait." Except? These don't sound like trivial obstacles to being able to hold full-time employment.

The reasons given for concluding that Alaura is capable of full-time gainful employment despite the administrative law judge's long list of his severe (her term) impairments are thin. True, he was better in May 2012, the date of his hearing before the administrative law judge, than he had been when he had his skull broken and a chunk of his brain removed. But how much better is unclear because at the time of the hearing more than a year had elapsed since Alaura had been examined by Drs. Kachmann and Banas, who appear (Kachmann especially) to have analyzed Alaura's brain-related impairments more thoroughly than any other doctors.

Above all, the administrative law judge made no effort to consider the *combined* effects on Alaura's ability to work of all his impairments and limitations. An administrative law judge is unlikely to be capable of assessing the interaction within and overall effect of such a collection of impairments; she is not a doctor. But she has access to the stable of medical consultants used by the Social Security Administration to evaluate applicants for disability benefits. Why didn't she ask a reputable neurologist and a reputable pain specialist, experts comparable to Kachmann and Banas, to examine Alaura and Alaura's medical records and offer an opinion on

his ability to do various forms of light work on a full-time basis? Kachmann and Banas had last seen Alaura in January and March 2011, respectively, more than a year before Alaura's administrative hearing; and the administrative law judge didn't issue her opinion until August 2012, roughly a year and a half after Alaura's last visits to them.

Not that they were the only doctors who examined Alaura and gave evidence. He was examined by Dr. Gautham Gadiraju in March 2011, but Gadiraju's field is internal medicine rather than neurology and so, unsurprisingly, there is virtually nothing in his report about Alaura's neurological symptoms. The administrative law judge rejected, moreover, without explanation, Dr. Gadiraju's opinion that Alaura can sit for only thirty minutes at a stretch and walk only six blocks at a time.

Alaura was later seen, as we noted, by a neurologist and a pain management specialist, Drs. Collins and Hedrick, but remember that virtually all that the administrative law judge said about their findings was that physically Alaura seemed to be in pretty good shape and in particular that he had no significant hearing loss. Yet these doctors reported that Alaura has chronic daily headaches, occipital neuralgia, atypical spells with suspected seizure activity, myofascial pain in his neck, dizziness, a mood disorder, and staring spells in which he experiences disorientation, confusion and lethargy consistent with complex partial seizure activity—*all* unremarked on by the administrative law judge.

There is probably some exaggeration in Alaura's and his mother's description of his physical and mental situation; for all we know, there is gross exaggeration. But the administrative law judge's scattershot analysis leaves us with no confi-

dence that Alaura's fitness for full-time gainful employment as of the hearing date was responsibly determined; and so the case must be returned to the Social Security Administration for reconsideration of his application for benefits.

We need to say something about the vocational expert's conclusion that (in the words of the administrative law judge) "the claimant is capable of making a successful adjustment to other work [that is, other than his pre-brain-injury employment as a warehouse worker, landscape laborer, and forklift driver] that exists in significant numbers in the national economy." The vocational expert said that there are 500 retail-marker jobs in Alaura's region, 7000 in the state, and 300,000 in the nation; 100 hand-packager jobs in the region, 2000 in the state, and 80,000 in the nation; and 100 addresser jobs in the region, 1500 in the state, and 200,000 in the nation. Why local and state statistics are included is unclear, since if there is a significant number of jobs that the applicant for benefits can perform anywhere in the United States he is deemed not disabled, *Browning v. Colvin*, 766 F.3d 702, 708 (7th Cir. 2014), although this surely exaggerates the mobility of a person with as many acknowledged severe impairments as Alaura.

Asked at argument where the job figures we just quoted from the administrative law judge's opinion came from, the Social Security Administration's lawyer said she had no idea and added that the agency's lawyers are forbidden to speak to vocational experts—which we find hard to believe, and which if true makes no sense at all. The administrative law judge said she'd "determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles" (U.S. Department of La-

bor, *Dictionary of Occupational Titles* (4th ed. 1991)), but she was wrong, because the DOT doesn't contain statistics. Anyway the DOT has been superseded by the O*NET (*Occupational Information Network)*—a fact ignored by the Social Security Administration's vocational experts and administrative law judges.

We have recently expressed concern with the source and validity of the statistics that vocational experts trot out in social security disability hearings, *Browning v. Colvin*, *supra*, 766 F.3d at 709; *Herrmann v. Social Security Administration*, 772 F.3d 1110, 1112–14 (7th Cir. 2014), as have other courts, *Brault v. Social Security Administration*, 683 F.3d 443, 446–47 (2d Cir. 2012) (per curiam); *Guiton v. Colvin*, 546 Fed. App'x 137, 143–45 (4th Cir. 2013) (concurring opinion), and commentators: Jon C. Dubin, "Overcoming Gridlock: *Campbell* After a Quarter-Century and Bureaucratically Rational Gap-Filling in Mass Justice Adjudication in the Social Security Administration's Disability Programs," 62 *Administrative Law Review* 937, 964–71 (2010); Peter J. Lemoine, "Crisis of Confidence: The Inadequacies of Vocational Evidence Presented at Social Security Disability Hearings (Part II)," *Social Security Forum*, Sept. 2012, p. 1. The problem appears to be that the only reliable statistics are census data for broad categories of jobs, rather than for jobs in the narrower categories that the applicant for benefits is capable of doing. Typically, it appears, the vocational expert simply divides the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the number of narrow *categories* in the broad category, *Browning v. Colvin*, *supra*, 766 F.3d at 709, thus assuming that each narrow category has the same number of jobs as each other narrow category—which is preposterous. A vocational expert's

stated number of jobs in a narrow category seems likely, therefore, to be a fabrication.

According to the DOT, an "addresser" is someone who "addresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail." "Addresser," U.S. Department of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), www.oalj.dol.gov/public/dot/references/dot02a.htm. It's hard to believe that, as the vocational expert testified in this case, there are 200,000 people in the United States for whom this is a full-time job. And does anyone use a typewriter anymore? Most addressing nowadays is either personal, as when one is sending a Christmas or get-well card, or automated, as in the case of business mailings, including mass mailings of advertisements or magazines. There is no indication that Alaura is capable of performing jobs typically found in automated mailing, such as bar-coding, pre-sorting, list management, variable data laser printing, folding, inserting, tabbing, warehousing, and shipping. See Automated Mailing Systems, Inc., www.automailsys.com/. And many of the jobs in the category "hand packager" are technical or demanding, *Browning v. Colvin*, *supra*, 766 F.3d at 710–12, and therefore likely, like most addresser jobs, to be beyond Alaura's ability to perform. Even "retail marker" is a lot more complicated than it sounds; here is the DOT's definition: "Marks and attaches price tickets to articles of merchandise to record price and identifying information: Marks selling price by hand on boxes containing merchandise, or on price tickets. Ties, glues, sews, or staples price ticket to each article. Presses lever or plunger of mechanism that pins, pastes, ties, or staples ticket to article. May record number and types of articles marked and pack them in boxes. May compare printed

price tickets with entries on purchase order to verify accura-
cy and notify supervisor of discrepancies. May print infor-
mation    on    tickets,    using    ticket-printing    machine."
www.occupationalinfo.org/20/209587034.html.

The denial of the application for benefits, and the affir-
mation of that denial by the district court, were premature.
The judgment is reversed with directions to remand the case
to the Social Security Administration for further considera-
tion of Alaura's application for benefits.

REVERSED AND REMANDED