In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2053

RYAN ALLENSWORTH,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN, Acting Commissioner of Social
Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 1162 — **Elaine E. Bucklo**, *Judge.*

ARGUED JANUARY 26, 2016 — DECIDED FEBRUARY 25, 2016

Before WOOD, *Chief Judge*, and BAUER and POSNER, *Circuit
Judges*.

POSNER, *Circuit Judge*. The plaintiff applied to the Social
Security Administration for disability benefits and was
turned down by the administrative law judge who heard his
case. He appealed to the district court, which affirmed, and
now appeals to us.

In 2008 he began having pain in his back that radiated to his legs. It turned out that he had a herniated disk and mild arthritis in the lumbar region of his spine (his lower back). The symptoms worsened. Dr. William Imlach had been treating him since 2010 (or perhaps earlier) for back pain, joint and leg pain, and hypersomnia (excessive daytime drowsiness) caused, it was later discovered, either by a neurological disorder called narcolepsy or more likely by severe obstructive sleep apnea, which causes a patient's breathing to stop and start repeatedly while he is asleep. See Mayo Clinic, "Sleep Apnea," www.mayoclinic.org/diseases-conditions/sleep-apnea/basics/definition/con-20020286 (visited February 24, 2016). The plaintiff also had migraine headaches and complained that his low-back pain was radiating into his legs and causing tingling and burning sensations and that he was experiencing numbness in his right leg; Dr. Imlach diagnosed a compressed nerve in the spine (radiculopathy).

Another doctor diagnosed the plaintiff with, among other ills, low-back pain, fibromyalgia, left-knee pain, fatigue, migraine headaches, and sleep apnea. He further reported that the plaintiff's range of motion in his lumbar spine was impaired and that a straight-leg-raising test had revealed impairments in mobility caused by low-back pain and by the large size of the plaintiff's abdomen. A third doctor diagnosed the plaintiff with chronic pain disorder, and also noted that the plaintiff's activities of daily living included performing light chores around the house and grocery shopping with his wife, and that he could get around the neighborhood by walking, driving, or getting a ride from others. Incidentally these last two doctors (numbers two and three) had not been retained by the plaintiff; they were consultants

to the Social Security Administration, which had directed the plaintiff to be examined by them.

Dr. Imlach, his primary treating physician, concluded that the plaintiff suffered from cervical and lumbar radiculopathy, as well as chronic pain, that these afflictions were not diminishing and that they limited him to standing for a total of no more than half an hour, and sitting for no more than an hour, in an 8-hour workday. In addition, during the workday he would have to elevate his feet, and lie down, frequently (since he can sit or stand for only an hour and a half in an eight-hour workday) in order to relieve his back pain. Imlach further opined that the medications that the plaintiff takes cause fatigue, diminished concentration, and somnolence—side effects that the doctor believed would markedly limit the plaintiff's ability to sustain concentration and pace during, and require that he take frequent breaks throughout, the workday. The plaintiff testified that he must take frequent naps lasting anywhere from five minutes to a few hours. His drowsiness often comes on unexpectedly, and he has fallen asleep at the computer, while using the restroom, and also while helping his son with his homework. He cannot hold a full-time job if he is unable to stay awake for long periods of time or falls asleep unexpectedly.

On top of everything the plaintiff is obese. Between 2009 and 2012 his weight fluctuated, usually between 280 and 310 pounds, yielding a BMI (bodily mass index) ranging from about 35 to 40 (based on his height of 6'2" to 6'3"). A BMI of 30 or more signifies obesity, a BMI of 35 or more severe obesity. The administrative law judge acknowledged that the plaintiff's obesity is "a condition that could aggravate his back, knee and OSA [obstructive sleep apnea] impairments."

See, e.g., Luciano F. Drager, *et al.*, "Obstructive Sleep Apnea: A Cardiometabolic Risk in Obesity and the Metabolic Syndrome," 62 *J. Am. College of Cardiology* 569 (2013).

The administrative law judge added that "other than a possible tie in with his sleep apnea and musculoskeletal complaints discussed above, there do not appear to be any particular complications from his obesity, such as hypertension or diabetes." But that is like saying that apart from not being able to see, a blind person has no particular complications from his blindness. The one complication is bad enough. And similarly the fact that the plaintiff's obesity is "a condition that could aggravate his back, knee and OSA [obstructive sleep apnea] impairments" is bad enough without its also giving him high blood pressure and diabetes.

The plaintiff's hearing before the administrative law judge took place in October 2012. He testified without contradiction to the symptoms reported by his doctors, and so far as activities of daily living were concerned said that they were (besides the basics, such as eating and sleeping) limited to tidying up his room and to computer surfing. He lives with his parents, and he said his mother runs all his errands. His 11-year-old son is autistic and attends a school just a block or two from home; the plaintiff drives him there. He testified to needing frequent naps, and falling asleep unexpectedly, even at home.

The evidence we've summarized would seem to have made a compelling case that the plaintiff is disabled from gainful employment, which normally requires an ability to work a 40-hour week without missing work more than twice a month. But the administrative law judge cited four instances in which she believed that Dr. Imlach's conclusions

were not supported by his medical reports: (1) Imlach's "physical examination [in August 2011] did not show findings of abnormality of the musculoskeletal system" and his "neck demonstrated no decrease in suppleness." (2) The plaintiff reported pain in his back and left knee but "the findings [which had been made in January 2012] … showed no evidence of neck symptoms or neurological symptoms." (3) In April 2012 "the claimant did not express any complaints of back or leg pain. The examination showed normal musculoskeletal system." And (4) an October 2011 MRI of the plaintiff's cervical (neck) spine had revealed only slight abnormalities.

Imlach saw the plaintiff about 17 times in the two-year period covered by the administrative law judge's criticisms, yet the criticisms were limited to four of those appointments—and were groundless. She misunderstood the August 2011 note (no. 1 above); the plaintiff's appointment with Dr. Imlach to which the note referred was merely to evaluate the efficacy of the medications that the plaintiff was taking for hypersomnia—yet even at that appointment the plaintiff reported that he was "having a lot of pain secondary to his back trouble." That his neck was supple and there was no evidence of neck or neurological symptoms (nos. 2 and 3 above) had no demonstrated relation to his complaints, which focused on pain in his lower back that may have resulted from nerve problems rather than from muscle or skeletal ones, let alone from problems with his neck. There is no indication that Dr. Imlach examined the plaintiff's back on this visit, so the note sheds no light on his assessment of the plaintiff's lower-back pain. And no. 2 further ignored the fact that at that appointment Imlach had referred the plaintiff to a specialist in back pain. No. 3 was another mischarac-

terization; Imlach's report states not that the plaintiff expressed no back pain but that he reported "no *new* complaints or concerns" (emphasis added). In no. 4, the administrative law judge pointed out the lack of serious abnormalities in the MRI of the plaintiff's cervical spine (the part of the spine that is in the neck) but ignored the more relevant MRI of his lumbar spine (the part of the spine in the lower back), which showed a herniated disk that could be the cause of his lower-back pain and radiating leg pain.

An especially troubling error by the administrative law judge was her failure to explain why she gave little weight to Imlach's findings that the plaintiff suffers fatigue and somnolence from his pain medications and that those conditions markedly limit his ability to concentrate and to work at a consistent pace. We know that Imlach regularly diagnosed the plaintiff with hypersomnia, prescribed several medications for the condition, and told the plaintiff to limit his driving. There is nothing to suggest an absence of medical reasons for these diagnoses and treatments.

The plaintiff's hypersomnia, caused it appears by sleep apnea and his pain medications, is a major ailment that would make it difficult for him to engage in gainful employment. The administrative law judge belittled the plaintiff's hypersomnia on the ground that the plaintiff had acknowledged that a CPAP (continuous positive airway pressure) machine, connected to a face mask or nasal pillow to treat sleep apnea, had given him some relief from that condition. But no evidence was presented that the relief was complete, or even substantial; the only evidence was that "his mornings are now more lucid." The plaintiff continued to insist that his hypersomnia was disabling and there is no

contrary medical evidence. The administrative law judge also overlooked uncontradicted evidence that the plaintiff has had to stop taking the drug that treated his hypersomnia most effectively—Adderall—because of its expense.

The administrative law judge also erred in finding the plaintiff not credible on the ground that he had "not been forthright in his allegations of … inability to perform work related activities," in particular in his testimony that all he does around the house is pick up in his room, when in his application for disability benefits he had listed his daily activities as cleaning dishes, vacuuming, sweeping, and mowing the lawn. The administrative law judge overlooked the fact that the plaintiff's living arrangements had changed since he had applied for benefits, because he and his wife had divorced and he had moved in with his parents and as a result no longer performs daily cleaning tasks. And assuming he could, though he doesn't, sweep the floor and do the dishes, this would be faint evidence of his capacity for full-time, gainful, out-of-home employment. *Voigt v. Colvin*, 781 F.3d 871, 878–79 (7th Cir. 2015); *Beardsley v. Colvin*, 758 F.3d 834, 838–39 (7th Cir. 2014); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). The administrative law judge even pointed to the plaintiff's testimony that he drives his son to school as showing that he had not been honest about the extent of his limitations. But the plaintiff drives his son the short distance to the child's school out of necessity—and against Dr. Imlach's orders.

A gaping hole in the record is the absence of any evidence that the plaintiff can lift or carry weight, stand or sit for six hours in an 8-hour workday, or maintain sufficient concentration to be able to perform simple, repetitive tasks—

yet without those capacities he is disabled from gainful em-
ployment. Although the administrative law judge concluded
that the plaintiff can perform light work for 40 hours a week,
she did not indicate what evidence supported that conclu-
sion—a fatal error: *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d
345, 352 (7th Cir. 2005). The judge mentioned that she was
restricting the plaintiff to simple work because of his sleep
apnea, but did not explain why someone with hypersomnia
should be able to stay awake at work just because it's simple
work. She inexplicably concluded: "I do not believe that the
evidence supports a finding that the claimant would fall
asleep in a work environment such as a workstation," with-
out however explaining why she thought that that environ-
ment would be less fatiguing than operating a computer or
driving a car.

In deciding that the plaintiff is not disabled from gainful
employment, the administrative law judge relied heavily on
the testimony of a vocational expert—reliance that is permis-
sible only if the testimony is reliable. *Overman v. Astrue*, 546
F.3d 456, 464 (7th Cir. 2008); cf. *Britton v. Astrue*, 521 F.3d
799, 803 (7th Cir. 2008). The vocational expert testified that
representative occupations in the regional economy, defined
as Chicago and the six collar counties, in which the plaintiff
is capable of being employed full time are "assembler,"
"handpackager," and "sorter." Yet the vocational expert
never explained whether the plaintiff could actually perform
them. The expert thought they fitted the administrative law
judge's definition of the plaintiff's ability, which is only to
do simple, routine work; so these jobs are irrelevant if the
plaintiff's hypersomnia prevents such work—and the voca-
tional expert testified that the plaintiff would be unemploy-

able if he falls asleep during the workday or misses four or more days of work per month.

An assembler, as defined by the *Dictionary of Occupational Titles* (on which vocational experts typically rely, though it is out of date), "performs repetitive bench or line assembly operations to mass-produce products." That sounds too strenuous for someone of the plaintiff's physical condition. The vocational expert estimated that there are 2700 assembler jobs in the regional economy (mistakenly reported as 2777 by the administrative law judge).

He estimated that there are 2250 handpackager jobs (mistakenly reported as 2225 by the administrative law judge), a category that covers a large variety of tasks, many likely to be beyond the plaintiff's capacity, such as inspecting molded plastic products (bottle caps for example) for defects and packing the inspected products into shipping cartons.

A sorter (again this is according to the definition in the *Dictionary of Occupational Titles*) "prepares filled whiskey bottles for packing and shipping … . Presses stamps on necks of bottles. Wipes excess glue and moisture from bottles. Packs whiskey bottles into cartons." Such work could require prolonged physical exertions, including standing, bending, and lifting. He testified that there are 1800 sorter jobs in the regional economy (mistakenly reported as 1880 by the administrative law judge), but was asked not whether these were jobs that the plaintiff with his disabilities could perform, but only whether they were jobs that could be performed by someone capable of doing simple, routine work, and there are people who can do simple, routine work that does not require any physical exertion but for whom most sorter jobs would be too strenuous. The relevant figure is

thus not 1800, but a smaller number that the vocational expert did not estimate, however, because he was not asked by the administrative law judge to do so.

Apart from the fact that the vocational expert did not explain where he got the job numbers (2700, 2250, 1800) from—we doubt that they are reliable statistics but will not press the issue—we have no idea how many jobs exist in the regional economy that the plaintiff's manifold disabilities would not prevent him from doing. But the question is academic, since even if his physical disabilities were properly accounted for, he does not appear to be capable of *any* full-time gainful employment, given his hypersomnia.

The judgment of the district court is therefore RE-VERSED, with instructions to REMAND the case to the Social Security Administration for further proceedings consistent with this opinion.