In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 15-3529

ELIZABETH G. TAYLOR,

*Plaintiff-Appellant*,

*v.*

CAROLYN W. COLVIN, Acting Commissioner of Social
Security,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cv-01118-DML-SEB — **Debra McVicker Lynch**,
*Magistrate Judge*.

———————————

ARGUED JULY 6, 2016 — DECIDED JULY 20, 2016

———————————

Before POSNER, SYKES, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff applied for Supplemental Security Income on the ground that she is intellectually disabled from full-time gainful employment. She was turned down by an administrative law judge, whose ruling was upheld on appeal to the district court by a magistrate judge, precipitating her appeal to us.

She had been a very poor student, unsurprisingly, be-
cause her IQ was (and presumably still is) between 70 and
75, indicative of an intellectual disability. In her final year of
high school she was functioning at only a fourth-grade level
in math, fifth grade in reading, and seventh grade in writing.
Her special-education teacher said that Taylor "struggles
with new concepts and tends to shut down when something
seems 'too hard' for her," has difficulty keeping up with in-
structions when they are "given too quickly," and has seri-
ous problems with learning new material, recalling previ-
ously learned material, and even caring for herself.

Now in her early twenties, living at home with her moth-
er, and never having worked, Taylor continues to exhibit
definite symptoms of a serious intellectual disability. She
needs her mother's help to get dressed, wash her hair, and
take her medications. She can do simple chores around the
house—though very slowly and only if reminded to do
them—but often, even if reminded, forgets *how* to do them.
She isn't allowed to cook by herself because her mother is
fearful about her using the stove. She becomes easily
stressed, and cries when she feels overwhelmed. She has
poor depth perception and is clumsy—both being conse-
quences of surgery to correct a lazy eye. She has seizures,
which though mostly controlled with medication produce
debilitating headaches that require her to sleep several hours
during the day. She has a history of kidney problems, which
have reduced her kidney function by 25 percent. She doesn't
know how to mail a letter.

A social security field officer who interviewed her re-
garding her application for benefits reported that after "al-
most every question that was asked of her she would look to

her mother before answering," and "she was very soft spoken and became teary-eyed because she was so nervous about the process." The officer concluded that her "capability [of working] is questionable."

A psychologist named Barrow who interviewed her noted that at times she "had difficulty understanding instructions and, at other times, [was] hesitant to provide answers." He assessed her as "currently functioning in the borderline range of intelligence." He found her verbal comprehension to be particularly low, and concluded that she suffers from "a significant learning disability" and has "markedly diminished" working memory and ability to sustain focus. He deemed her "incapable of managing her funds independently" but offered no opinion on whether she could hold down a job.

Oddly, another psychologist, Gange, who did not interview Taylor but instead relied on her application for benefits and on what Barrow had said, concluded that she could "understand, remember, and carry-out simple tasks," "relate on at least a superficial basis … with coworkers and supervisors," "attend to task[s] for sufficient periods of time to complete tasks," was "not significantly limited" in her "ability to maintain attention and concentration for extended periods," and could "manage the stresses involved with simple work."

But there is no basis in the record for this assessment—no basis for thinking Taylor can carry out simple tasks in a workplace environment where she wouldn't have a mother or a mother substitute to tell her what to do, or that she can relate to coworkers and supervisors since she's never had a job (with a nominal exception to which we'll come in a mo-

ment). There is also no basis for thinking her able to maintain attention and concentration for extended periods—she never has.

The closest she's had to a job was, in the year preceding the disability hearing, volunteering an hour a week at the local public library to "fold brochures, cut slips and notices, and affix labels to a monthly magazine subscription." The librarian reported that Taylor "completes her tasks well" but "has problems following procedures unless she has a list to follow, which her mother created for her." The librarian said she "would hesitate in giving [Taylor] any more responsibilities" than those involved in her hour-a-week volunteer position.

Asked by the administrative law judge at her disability hearing whether she thought she'd ever be able to live on her own, Taylor said "I don't think so." She said she plays some video games but can't drive or handle her own money; doesn't shop or cook without her mother; and sometimes requires help showering, fixing her hair, and remembering to take her medications. She doesn't know her own weight, or know how to text.

The administrative law judge, remarking that Taylor had not engaged in substantial gainful activity and that her cognitive disorder was a severe impairment but that her seizures, kidney disease, and lazy eye were not, concluded with no basis in the record that Taylor can "perform … routine, unskilled work at a fourth or fifth grade level." Not only is that conclusion unfounded, but one doesn't need child-labor laws (though we have them) to realize that an adult with no greater capability for full-time work than a fourth- or fifth-grader is incapable of full-time gainful employment.

The administrative law judge conjectured that because Taylor is "a young adult" who can play video games and is "learning these new tasks" (what new tasks?), she may experience "increased function with maturity." Maybe so—anything is possible. But there is no evidence to support the administrative law judge's conjecture. And he ignored the doubt we expressed in *Voigt v. Colvin*, 781 F.3d 871, 878–79 (7th Cir. 2015), that playing video games requires the same level of concentration as working full time.

He acknowledged that observing Taylor during the hearing gave him only a "snapshot" of her, which was doubtless true but hardly a reason to deny her benefits. He accorded only "limited weight" to the mother's uncontradicted testimony about Taylor's inability to care for herself because it was a "lay opinion"—which of course most evidence is. He went so far as to say that her hour a week in the library indicated that she could engage in "higher functioning"—a conclusion directly contrary to the librarian's statement that she "would hesitate in giving [Taylor] any more responsibilities" beyond the meager tasks in the library that Taylor had not managed to commit to memory after a year of practice.

The administrative law judge purported to give "great weight" to Barrow's report—or rather to the fact that Barrow had "noted nothing of [Taylor's] inability to work." But he had been asked only to assess her mental functioning. While overlooking the statement in Barrow's report that Taylor's memory and ability to focus were "markedly diminished," the administrative law judge injected that curious conjecture about performing "routine, unskilled work at a fourth or fifth grade level," contrary to our rejection of the view that "confining the claimant to simple, routine tasks and limited

interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." E.g., *Yurt v. Colvin*, 758 F.3d 850, 858–59 (7th Cir. 2014).

As is customary in disability hearings a vocational expert employed by the Social Security Administration was asked what full-time jobs if any the applicant could perform, assuming the applicant wasn't totally disabled from gainful employment. The vocational expert testified that "*if*" (a huge "if") Taylor could do routine or unskilled work involving only infrequent interpersonal contact and no exposure to hazards, she could work as a cleaner, assembler, hand packer, or machine feeder. The vocational expert failed, however, to explain the source or accuracy of her data concerning the number of such jobs that exist in the economy, an oversight we criticized in *Alaura v. Colvin*, 797 F.3d 503, 507–08 (7th Cir. 2015), and *Voigt v. Colvin, supra*, 781 F.3d at 879.

The expert said "these jobs are not considered fast-paced jobs. They do require accuracy." But, he added—a big "but"—a person who needed "occasional redirection by a supervisor" (up to one-third of the workday) in order to remain on task would be unable to work. Five witnesses indicated that Taylor was such a person: the librarian, the teacher, the mother, the Social Security field officer, and Barrow. The administrative law judge ignored their evidence, contrary to our ruling in *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), that an administrative law judge "must confront the evidence that does not support her conclusion and explain why that evidence was rejected." He ignored the voluminous record evidence establishing that Taylor's intellectual deficiencies disable her from working full time. Indica-

tive that the administrative law judge wasn't even concentrating on the testimony or other evidence at the disability hearing, he twice referred in his opinion to Taylor as a male.

True, there was Gange, who—remember—had checked a box indicating that Taylor was "not significantly limited" in her "ability to maintain attention and concentration for extended periods." But neither Gange, who said he relied on Barrow's report, nor the administrative law judge, nor anyone else, offered any reason for disagreeing with Barrow's opinion that Taylor's abilities are markedly impaired. The denial of the benefits sought by Taylor was unsupported, and the district court should not have affirmed it.

The judgment of that court is reversed with instructions to remand the case to the Social Security Disability Office for further proceedings consistent with this opinion.